IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

DONALD G. ALLEN
    Plaintiff,

v.                           Case No.: 5:12-cv-00196-CJK

CAROLYN W. COLVIN[1]
Commissioner of Social Security,
    Defendant.

_____

## MEMORANDUM ORDER

This case is now before the court pursuant to 42 U.S.C. § 405(g), for review of a final determination of the Commissioner of Social Security ("Commissioner") denying Donald Allen's application for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-34, and Supplemental Security Income benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-83. Mr. Allen will be referred to by name, as claimant, or as plaintiff. The parties have consented to Magistrate Judge jurisdiction, pursuant to 28 U.S.C. § 636(c), and FEDERAL RULE OF CIVIL PROCEDURE 73, for all proceedings in this case, including entry of final judgment. (Doc. 8).

Upon review of the record before this court, I conclude that the findings of fact and determinations of the Commissioner are not supported by substantial evidence.

_____

[1] Carolyn W. Colvin succeeded Michael J. Astrue as Commissioner of Social Security, and is automatically substituted as the respondent. FED. R. CIV. P. 25(d).

The decision of the Commissioner, therefore, should be vacated, and the matter remanded for further proceedings.

<u>PROCEDURAL HISTORY</u>

Claimant has filed a Title II application for a period of disability and disability insurance benefits.  T. 10.[2]  Claimant also filed a Title XIV application for supplemental security income.  T. 10.  His applications were denied initially on December 5, 2008, and upon reconsideration on March 9, 2009.  T. 10.  Claimant then requested, and appeared at, a hearing before an Administrative Law Judge (ALJ) on October 26, 2010.  T. 10.  Following this hearing, the ALJ issued an order unfavorable to Mr. Allen.  T. 7.  The Appeals Council of the Social Security Administration subsequently denied review.  T. 1.  The ALJ's order then became the final decision of the defendant Commissioner.

<u>FINDINGS OF THE ALJ</u>

In the written decision the ALJ made a number of findings relative to the issues raised in this appeal:

3.    The claimant has the following severe impairments: status post right hip fracture, right knee pain, and low back pain.

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

---

[2] The administrative record, as filed by the Commissioner, consists of 9 volumes (doc. 7-1 through 7-9), and has 448 consecutively numbered pages.  References to the record will be by "T." for transcript, followed by the page number.

5.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform the full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b).

6.     The claimant is unable to perform any past relevant work.

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11.    The claimant has not been under a disability, as defined in the Social Security Act, from October 17, 2007, through the date of this decision.

T. 10-19.

In his memorandum of law, claimant raises two issues: the ALJ substituted his own medical opinion for that of Drs. Derbes, Goodwiller, Baltazar, Buchalter, and Faruqui; and due to the ALJ's failure to properly consider these medical opinions, the ALJ formulated an incorrect residual functional capacity (RFC) assessment. (Doc. 12, p. 10).

STANDARD OF REVIEW

A federal court reviews a Social Security disability case to determine whether the Commissioner's decision is supported by substantial evidence and whether the correct legal standards were applied by the ALJ. *See Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997); *see also Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th

Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."). Substantial evidence is "'such relevant evidence as a reasonable person would accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)). With reference to other standards of review, the Eleventh Circuit has said, "'Substantial evidence is more than a scintilla . . . .'" *Somogy v. Comm'r of Soc. Sec.*, 366 F. App'x 56, 62 (11th Cir. 2010) (quoting *Lewis*, 125 F.3d at1439). Although the ALJ's decision need not be supported by a preponderance of the evidence, "it cannot stand with a 'mere scintilla' of support." *Hillsman v. Bowen*, 804 F.2d 1179, 1181 (11th Cir. 1986). The reviewing court "'may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the Secretary[.]'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990) (quoting *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)). Nevertheless, a reviewing court may not look "only to those parts of the record which support the ALJ[,]" but instead "must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983). In sum, review is deferential to a point, but the reviewing court conducts what has been referred to as "an independent review of the record." *Flynn v. Heckler*, 768 F.2d 1273, 1273 (11th Cir. 1985); *see also Getty ex rel. Shea v. Astrue*, No. 2:10–cv–725–FtM–29SPC, 2011 WL 4836220 (M.D. Fla. Oct. 12, 2011); *Salisbury v. Astrue*, No. 8:09-cv-2334-T-17TGW, 2011 WL 861785 (M.D.

Fla. Feb. 28, 2011).[3] The recitation of medical and historical facts of this case, as set out below, is based upon my independent review.

The Social Security Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).[4] To qualify as a disability, the physical or mental impairment must be so severe that the plaintiff is not only unable to do her previous work, "but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)-(g), the Commissioner analyzes a disability claim in five steps:

1. If the claimant is performing substantial gainful activity, she is not disabled.

2. If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

3. If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of

---

[3] The Eleventh Circuit speaks not only of independent review of the administrative record, but reminds us it conducts *de novo* review of the district court's decision on whether substantial evidence supports the ALJ's decision. *See Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002).

[4] Claimant is seeking both Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-34, and Supplemental Security Income benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-83. All references to statutes and rules in this order will be to those addressing Disability Insurance Benefits.

any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4. If the claimant's impairments do not prevent her from doing her past relevant work, she is not disabled.

5. Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates her residual functional capacity and vocational factors, she is not disabled.

Claimant bears the burden of establishing a severe impairment that keeps her from performing her past work. *See* 20 C.F.R. § 404.1512. The Eleventh Circuit has explained the operation of step five. *See Doughty v. Apfel*, 245 F.3d 1274, 1278 n.2 (11th Cir. 2001) ("In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations. *See Brown v. Apfel*, 192 F.3d 492, 498 (5th Cir. 1999) (*quoting Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987) ('The shifting of the burden of proof is not statutory, but is a long-standing judicial gloss on the Social Security Act')).").

Step five (or step four in cases where the ALJ decides a claimant can perform her past work) is where the rubber meets the road. At that point, the ALJ formulates the all-important residual functional capacity. Even where one or more severe

impairments are established, the claimant must show that she cannot perform work within that residual functional capacity. The ALJ establishes residual functional capacity, utilizing the impairments identified at step two, by interpretation of (1) the medical evidence, and (2) the claimant's subjective complaints (generally complaints of pain). Residual functional capacity is then used by the ALJ to make the ultimate vocational determination required by step five.[5] "[R]esidual functional capacity is the most [claimant] can still do despite [claimant's] limitations."[6] 20 C.F.R. § 404.1545(1). Often both the medical evidence and the accuracy of a claimant's subjective complaints are subject to a degree of conflict, and that conflict leads, as in this case, to the points raised on judicial review by many disappointed claimants.

---

[5] "Before we go from step three to step four, we assess your residual functional capacity. (See paragraph (e) of this section.) We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps." 20 C.F.R. § 404.1520(a)(4).

[6] In addition to this rather terse definition of residual functional capacity, the Regulations describe how the Commissioner makes the assessment:

> (3) Evidence we use to assess your residual functional capacity. We will assess your residual functional capacity based on all of the relevant medical and other evidence. In general, you are responsible for providing the evidence we will use to make a finding about your residual functional capacity. (See § 404.1512(c).) However, before we make a determination that you are not disabled, we are responsible for developing your complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help you get medical reports from your own medical sources. (See §§ 404.1512(d) through (f).) We will consider any statements about what you can still do that have been provided by medical sources, whether or not they are based on formal medical examinations. (See § 404.1513.) We will also consider descriptions and observations of your limitations from your impairment(s), including limitations that result from your symptoms, such as pain, provided by you, your family, neighbors, friends, or other persons. (See paragraph (e) of this section and § 404.1529.)[.]

20 C.F.R. § 404.1545(a)(3).

## FACT BACKGROUND AND MEDICAL HISTORY[7]

Mr. Allen disputes the weight the ALJ afforded to certain doctors' findings, as well as the ALJ's conclusion regarding Mr. Allen's residual functional capacity. Attention will first be given to evidence developed at the ALJ hearings.

At the hearing, claimant said he had been a laborer who built pole barns, but fell three years ago and injured his right hip and back. T. 29-30. Plaintiff underwent hip surgery and had pins placed in his right hip. T. 30. Since the accident, plaintiff continues to have sharp pains in his back and right leg numbness on occasion. T. 31. He also has sharp back pain about every other day. T. 31. As of the date of the hearing, plaintiff had not required back surgery, and had been treated with injections. T. 31. Plaintiff testified that doctors have mentioned surgery for his back, but he wants to try "shots and stuff first." T. 36. He can work around the house for ten or fifteen minutes, but then needs to rest for a bit before he can work again. T. 31. He cannot walk the length of a football field without pain, and he can sit through about half of a movie before he has to get up to move around. T. 31-32. He stated that he is in pain daily. T. 32. Plaintiff estimated that he has gained about thirty pounds since the accident, which has brought his weight up to about 206. T. 33.

In addition to the back and hip injuries, claimant testified he also has a bad knee that has gotten worse since his fall. T. 35. His knee will "pop[] out of joint" about once a month. T. 35. Evaluating his strength, claimant believed he could "probably tote a little more than a [gallon of milk] . . . . [A]ll day long." T. 36. He

---

[7] Although intended to be thorough, and to provide an overview of claimant's history of care and treatment, the synopsis of medical evidence will be supplemented as called for in the Analysis section.

feels pain when he bends over, but he still tries to tie his shoes and work around the house.   T. 36-37.   Claimant takes Neurontin for nerve pain and Tramadol for "regular" pain.   T. 38.

Vocational expert Ronnie Mayne considered a hypothetical involving someone with the same age, education, and past work experience as the claimant, and who had a residual functional capacity of light work.   T. 39.   Mr. Mayne found that such an individual could perform the jobs of vegetable sorter, parking lot attendant, and common area cleaner.   T. 39.   In a different hypothetical, if the previous individual needed to have the option to sit or stand, and this condition was an ongoing one, there would be no jobs for that individual in the regional or national economies.   T. 39-40.

Dr. Richard Vlasak, the surgeon who repaired Mr. Allen's right hip fracture, T. 246-49, remarked in a follow up visit on April 15, 2008, six months after surgery, that claimant was doing "exceptionally well" and "has returned back to his job as a construction worker." T. 269.   Dr. Vlasak further noted that claimant was "not on any pain medications" at that time and could "resume all normal activities" without any "restrictions."   T. 269.

On November 12, 2008, plaintiff visited Dr. Iqbal Faruqui to undergo examination for social security disability purposes. T. 296.   Dr. Faruqui recorded that plaintiff still uses a cane "on occasion" and cold weather aggravates plaintiff's hip condition.   T. 296.   In regard to his current level of pain, the plaintiff reported that he has constant pain in his right hip, low back and right knee, "which gets worse with prolonged standing walking, sitting, bending and with cold weather."   T. 296. Plaintiff also stated that, "[h]e cannot drive for more than 15 minutes," and is "unable to be in one position for [a] long time . . . ."   T. 296-97.   Dr. Faruqui, in his

assessment/recommendations, reiterated plaintiff's reported limitations by noting plaintiff "is not able to bend over or carry anything and not able to be in one position for a prolonged time. [Plaintiff] is not able to be in one position for a prolonged time. He is not able to sit, stand or walk for more than 15-20 minutes or maximum 30 minutes." T. 299. In terms of injuries, Dr. Faruqui observed plaintiff "had a contusion to his back and as per report has anterior pneumothorax and splenic laceration . . . he had ORIF of right hip area where seven or eight pins were placed." T. 299. Dr. Faruqui concluded that "due to his injuries [plaintiff] is not able to work at all and not able to get employment. He does not have any other skill to apply for more sedentary job." T. 299.

Dr. Stacey Newsom examined the plaintiff on December 2, 2008, for worker's compensation purposes, and noted "[right] hip pain s/p ORIF," "[right] knee pain possible meniscus injury," and "low back pain."[8] T. 316. Dr. Newsom determined that Mr. Allen has "limitations likely to prevent him from returning to heavy work," but that vocational rehabilitation "should be considered." T. 316.

On December 10, 2008, upon referral from Dr. Newsom, claimant had an MRI on his right knee, from which Dr. John Tomberlin noted: 1) no evidence of acute injury; 2) rather marked atrophy and decrease (sic) delineation of the anterior cruciate ligament consistent with chronic change; and 3) slight degeneration of the medial meniscus without definite tear noted. T. 317-18. About a week later on December 19, 2008, plaintiff underwent an MRI of the right hip, administered by Dr. Steven Sukstorf. T. 337. Dr. Sukstorf recorded his impression of: 1) metallic foci about the

---

[8] Dr. Newsom's notes are handwritten and not typed. As such, the court has difficulty reading every notation. Much of the report, however, is legible upon close inspection.

right hip, illium and ischium, no gross evidence of definitive hip lesion, potential healed injury as discussed, some artifact limits the exam; 2) gross character left hip, otherwise unremarkable; and 3) SI joints, left pelvis, the deep pelvic structures grossly unremarkable. T. 337. In a separate MRI of plaintiff's lumbar spine, done that same day, Dr. Sukstorf found "spondylosis with disc protrusion at L4-5 with impinged S1 roots, facet arthropathy."[9] T. 338.

On December 15, 2008, Mr. Allen visited orthopaedic surgeon Dr. Steven Goodwiller. T. 370-71. In the initial visit, Dr. Goodwiller noted, after review of claimant's December 10 MRI scan of the right knee, claimant appeared to have "slight degeneration of the medical meniscus without tear . . . [and] atrophy of the ACL" with "no evidence of acute injury." T. 370. Mr. Allen said he was taking Ultram for pain. T. 371. Dr. Goodwiller noted the possibility of hip replacement surgery "down the road" but presently, the "joint space is well maintained and [hip replacement] is not felt to be eminent [sic]." T. 370. An x-ray of the right knee was unremarkable. T. 370. Dr. Goodwiller posited that "[claimant] can work at sedentary levels . . . ." T. 370.

In the follow-up session on December 31, 2008, Dr. Goodwiller noted that claimant's lumbar MRI (discussed above) showed a "disc protrusion with abutment of both S1 nerve roots, which are displaced." T. 369. In Dr. Goodwiller's opinion, the MRI scan of claimant's hip showed no gross evidence of hip lesion and hardware related to claimant's fracture. T. 369. Claimant was told to continue with

---

[9] These observations appear in the "IMPRESSION" portion of the MRI report. For reasons not apparent, the "FINDINGS" portion, although confirming S1 impingement, does not confirm the L4-5 disc protrusion, and in fact notes, "on axial views as well through L4-5; unremarkable." T. 338.

Meloxicam. T. 369. Dr. Goodwiller discussed with the plaintiff that his symptoms are likely to be multifactorial in origin and, in Dr. Goodwiller's opinion, plaintiff is employable at sedentary levels. T. 369. Dr. Goodwiller was of the belief that vocational redirection would be a "strong consideration" in attempting to get the plaintiff employed again. T. 369. Plaintiff again visited Dr. Goodwiller on January 19, 2009, with Dr. Goodwiller again concluding that plaintiff was "employable at sedentary levels." T. 368.

A month later on February 17, 2009, plaintiff again visited Dr. Goodwiller. T. 367. The day before the visit, plaintiff stepped in a hole and twisted his right knee, markedly increasing his knee pain. T. 367. On examination, Dr. Goodwiller observed "some boggy synovial swelling and probable small right knee effusion . . . . Motion of the knee is minus 5 to 70 degrees." T. 369. Dr. Goodwiller charted that plaintiff had acute and chronic strain in the right knee and a history of acetabular fracture, post ORIF right hip. T. 367. Dr. Goodwiller also recognized a prior notation of "some atrophy of the ACL consistent with chronic pain." T. 367. Similar to the other visits, Dr. Goodwiller noted plaintiff's employability at sedentary levels. T. 367. Plaintiff's knee was injected with 40 milligrams Depo Medrol and 4 cc's .5% plain Marcaine. T. 367. In a visit two weeks later on March 4, 2009, plaintiff reported improvement in his right knee pain with the injection. T. 366. Dr. Goodwiller again noted "[f]racture right acetabulum status post ORIF and strain right knee" and that plaintiff was "employable at sedentary levels." T. 366.

Mr. Allen visited Dr. Goodwiller several more times through May 2010, T. 410-17, 442, and at each visit Dr. Goodwiller continued to find Mr. Allen employable at sedentary levels. T. 410-17. In some visits, Dr. Goodwiller noted that claimant is

employable from the standpoint of the hip and knee with no "bending, stooping climbing or prolonged standing." T. 412, 414-15. The final recorded visit took place on May 20, 2010, and Dr. Goodwiller noted that Mr. Allen "is looking for work but has not found it[,]" and reiterated his conclusion that claimant is employable at sedentary levels. T. 442. Dr. Goodwiller's impression of Mr. Allen's condition was "[f]racture right acetabulum post open reduction and internal fixation," T. 410, 412, 414-17, with patellofemora pain right knee. T. 414-17. During a physical examination, Dr. Goodwiller noted "tenderness in the right anterior hip. Full motion of the hip is present and there is groin pain at limits of internal rotation and abduction." T. 442.

Plaintiff also underwent physical therapy from December 5, 2008 through February 6, 2009, with Andrea Temples. T. 364. Physical Therapist Temples noted that plaintiff participated in passive, active, and resistive exercise. T. 364. Ms. Temples noted an increase in flexibility of plaintiff's right hip at the time of discharge, but that plaintiff continued to report that his right knee "pops." T. 364. Ms. Temple commented that plaintiff made "progress" and that the plaintiff should continue to progress if he is compliant. T. 364.

On March 7, 2009, Dr. Efren Baltazar conducted a physical residual functional capacity assessment. T. 379-86. Dr. Baltazar reviewed the medical evidence in the record and determined that claimant could occasionally lift and/or carry 10 pounds, frequently lift and/or carry less than 10 pounds, stand and/or walk (with normal breaks) a total of at least 2 hours in an 8 hour workday, sit (with normal breaks) a total of about 6 hours in an 8 hour workday, and claimant was limited in his lower extremities with regards to the ability to push and/or pull. T. 380. Dr. Baltazar

concluded that claimant appeared capable of performing activities within the parameters of the assessment.  T. 384.

Dr. Thomas Derbes, a neurologist and pain management physician, examined the claimant on April 14, May 13, June 17, and September 30, 2009.  T. 390-403. Claimant's chief complaint was low back pain.  T. 400.  Claimant also complained of dull, aching pain in the right hip; and sharp shooting, throbbing and tender pain in the right knee, aggravated by walking and standing.  T. 393.  In assessing claimant's work capabilities Dr. Derbes concluded, "lumbar light duty: no lifting greater than 20 pounds, no prolonged bending, stooping, squatting, kneeling, static squat, ladder climbing, crawling or repetitive use of the legs.  No working in situations where the inability to use legs might put the patient in a position for injury."  T. 394, 398, 401. In regards to claimant's lumbar spine, Dr. Derbes noted "[p]ain upon sitting. [Claimant] is able to arise from a seated position,"  T. 392, and that "[i]nspection reveals swelling.  Palpation reveals tenderness in the right Lateral flexion examination reveals pain and decreased [range of motion]."  T. 396.  Dr. Derbes determined that claimant had chronic low back pain syndrome with L5-S1 degenerative disc disease with S1 radiculitis, T. 390-91, 396, 398, 401, and facet arthropathy/clinical symptomatology. T. 390-91, 396. Dr. Derbes also assessed right hip pain and referenced a history of fracture with plate and pins.  T. 390-91, 395. From the record it appears that claimant consented to injections, T. 390, and was possibly administered a lumbar facet joint injection at L4-5, L5-S1 on the right lower back and an epidural at L5-S1 on the right lower back.  T. 395.  The record also indicates that Dr. Derbes recommended Mr. Allen receive a TENS unit, but such a request was denied at that time.  T. 445.  Claimant was noted to be on Neurontin and

Ultram, T. 390, 393, 397, and at times on Mobic. T. 393, 397. Under the plan section of claimant's examination, Dr. Derbes detailed a three-tiered approach: 1) flexibility and stretching; 2) strengthening and resistance training; and 3) progressive cardiovascular fitness program such as walking. T. 398, 401. Nevertheless, Dr. Derbes also noted that physical therapy, at that point, had not resolved claimant's pain. T. 398, 401.

On December 7, 2009, Mr. Allen underwent a Physical Work Performance Evaluation administered by James Cox, a physical therapist. T. 418-21. Mr. Cox determined that plaintiff's overall level of work "[f]alls within the light range. Exerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or negligible amount of force constantly . . . to move objects. Physical demand requirements are in excess of those for Sedentary Work." T. 418. In reference to plaintiff's tolerance for an eight hour work day, Mr. Cox concluded, "[t]he [plaintiff] is incapable of sustaining the Light level of work for an 8-hour day/40-hour week. However, individual task scores indicate this client has the standing and walking ability sufficient for Light work. If allowed to work at the Sedentary level the client can tolerate the 8-hour day." T. 418.

Dr. Robert Joseph evaluated the claimant at the Pain Clinic of Northwest Florida, Inc., on July 23, 2010. T. 428-37. Dr. Joseph conducted a thorough review of the medical records, T. 428-34, and believed an epidural "is a very reasonable place to start." T. 436. Dr. Joseph assessed that claimant "can work at a light duty or sedentary physical demand level," but did not envision claimant capable of performing heavy duty work. T. 437. Dr. Joseph recommended a prescription of Lortab (hydrocodone), and also refilled the prescriptions for Neurontin, Ultram, and

Zanaflex. T. 436-37. On August 3, 2010, Dr. Joseph diagnosed intractable low back pain and performed a "lumbar epidural steroid injection." T. 440. Claimant reported "good relief of pain." T. 441. On a follow up on August 12, 2010, claimant professed a return of the pain in his lower back and right hip, buttock, and leg. T. 427. Dr. Joseph believed he needed to "work up the facet joints" and noted that "[claimant's] goal needs to be returning to work and getting off the pain pills." T. 427. On September 17, 2010, Dr. Joseph's diagnosed chronic low back pain and lumbar facet syndrome. T. 438. Dr. Joseph performed a "bilateral lumbar diagnostic L4-L5 and L5-S1 facet joint median branch blocks by blocking the bilateral L4, L5, and S1 branch at the sacral ala dorsal median branch nerves." T. 438. Following this procedure, claimant reported that he experienced "100% relief in his pain." T. 439. During a follow up on September 23, 2010, claimant, however, reported the pain returned the day after the nerve blocks. T. 426. Dr. Joseph noted during this follow up that the claimant, "has only one spot in his back at the coccyx that is tender." T. 426.

At the request of a Florida workers' compensation judge, Dr. Jeff Buchalter, on October 21, 2010, conducted an expert medical advisor[10] evaluation to resolve the

---

[10]As provided by Florida workers' compensation law:

> If there is disagreement in the opinions of the health care providers, if two health care providers disagree on medical evidence supporting the employee's complaints or the need for additional medical treatment, or if two health care providers disagree that the employee is able to return to work, the department may, and the judge of compensation claims shall, upon his or her own motion or within 15 days after receipt of a written request by either the injured employee, the employer, or the carrier, order the injured employee to be evaluated by an expert medical advisor. The opinion of the expert

conflicting assessments of Dr. Derbes and Dr. Christo Koulisis regarding the necessity of a TENS unit, lumbar facet injections, and epidural injections. T. 445. Dr. Buchalter assessed: 1) status post right acetabular fracture requiring open reduction, internal fixation; 2) L5-S1 disk protrusion with annular tear; 3) bilateral S1 nerve root impingement; 4) mechanical right hip and groin pain; and 5) right lower extremity radicular pain. T. 447. As a result of these conditions, Dr. Buchalter found a TENS unit and a single intralaminar lumbar epidural injection, followed by another epidural injection, medically reasonable and necessary. T. 448. If claimant did not respond to the epidural steroid injections, a single bilateral lumbar facet injection through either an intraarticular approach or medial branch block approach would be "medically necessary and reasonable." T. 448.

Turning back to the ALJ's decision, the ALJ summarized the weight he afforded to the various physicians' medical opinions and conclusions:

> In terms of the opinion evidence, the undersigned has considered the opinion of the claimant's treating physician, Dr. Joseph, who opined the claimant could work at a light duty or sedentary physical demand level. The undersigned gives great weight to this opinion as it is consistent with the medical evidence of record and the record as a whole.

> The undersigned has considered the opinion of the claimant's treating physician, Dr. Goodwiller, who offered his opinion that the claimant was capable of sedentary level work as detailed above. The

---

medical advisor is presumed to be correct unless there is clear and convincing evidence to the contrary as determined by the judge of compensation claims.

§ 440.13(9)(c), Fla. Stat. (2010)

undersigned gives this opinion no weight as it is not consistent with his own treating records, indicating mild objective findings and conservative treatment. Additionally, the record as a whole does not support this opinion.

The undersigned has considered the opinion of the claimant's treating physician, Dr. Derbes, who concluded that the claimant was limited to lifting no greater than 20 pounds and had additional postural limitations, as detailed above. To the extent that Dr. Derbes' opinion is more restrictive than the assessed residual functional capacity, the undersigned gives it little weight, as those restrictions are not consistent with the medical evidence of record or supported by the record as a whole. To the extent that Dr. Derbes' opinion is consistent with the residual functional capacity to perform light level work, the undersigned gives the opinion significant weight, as the record as a whole supports the restriction.

Additionally, the undersigned gives some weight to the opinion of Dr. Newsom who concluded that the claimant's limitations would prevent him from returning to heavy work. While this opinion is largely consistent with the objective physical findings of record and supported by the record as a whole, the undersigned has assessed a reduced residual functional capacity as outlined above.

Furthermore, the undersigned has considered the opinion of the consulting examiner, Dr. Faruqui, who assessed postural limitations, as noted above. The undersigned gives this opinion no weight as it is not consistent with his own findings, and is not supported by the record as a whole.

Additionally, the undersigned has considered the opinion submitted by James Cox, P.T. of ErgoScience who concluded that the claimant was incapable of sustaining light level of work for an 8-hour day, 40- hour [sic] week, although he had the standing and walking ability for light work. As this opinion is vague and contradictory, the undersigned gives it no weight.

Finally, the undersigned has considered the opinion of the State agency medical consultant who reviewed the record on reconsideration and found the claimant capable of a reduced range of sedentary work. To the extent that this opinion contains greater or additional restrictions than the assessed residual functional capacity, the undersigned gives it little weight, as those restrictions are not consistent with the medical evidence or supported by the record as a whole. (exhibit references omitted).

T. 17-18.

## ANALYSIS

On review plaintiff argues 1) "the ALJ substituted his own medical opinion for those of Drs. Derbes, Goodwiller, Baltazar, Buchalter, and Faruqui, many of who had a long history of treatment with Mr. Allen and were specialists in their field, by determining that plaintiff could perform the full range of light work" with no non-exertional limitations, and 2) "[t]he ALJ's failure to take into account the opinions of the aforementioned physicians resulted in an incorrect determination of plaintiff's residual functional capacity . . . ." (Doc. 12, p. 10). The Commissioner has promulgated a rule to guide the evaluation and application of medical opinion evidence:

**Evaluating opinion evidence**.

**\*\*\*\***

**(c) How we weigh medical opinions**. Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.

**(1) Examining relationship**. Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

**(2) Treatment relationship.** Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(I) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

**(I) Length of the treatment relationship and the frequency of examination**. Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source.

**(ii) Nature and extent of the treatment relationship.** Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of

examinations and testing the source has performed or ordered from specialists and independent laboratories. For example, if your ophthalmologist notices that you have complained of neck pain during your eye examinations, we will consider his or her opinion with respect to your neck pain, but we will give it less weight than that of another physician who has treated you for the neck pain. When the treating source has reasonable knowledge of your impairment(s), we will give the source's opinion more weight than we would give it if it were from a nontreating source.

**(3) Supportability**. The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion. Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

**(4) Consistency.** Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

**(5) Specialization.** We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

**(6) Other factors.** When we consider how much weight to give to a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion. For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the

other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

\*\*\*\*

**(e) Opinions of nonexamining sources**. We consider all evidence from nonexamining sources to be opinion evidence. When we consider the opinions of nonexamining sources, we apply the rules in paragraphs (a) through (d) of this section. In addition, the following rules apply to State agency medical and psychological consultants, other program physicians and psychologists, and medical experts we consult in connection with administrative law judge hearings and Appeals Council review:

\*\*\*\*

(2) Administrative law judges are responsible for reviewing the evidence and making findings of fact and conclusions of law. They will consider opinions of State agency medical or psychological consultants, other program physicians and psychologists, and medical experts as follows:

(I) Administrative law judges are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists. State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation. Therefore, administrative law judges must consider findings and other opinions of State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists as opinion evidence, except for the ultimate determination about whether you are disabled (see § 404.1512(b)(8)).

(ii) When an administrative law judge considers findings of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist, the administrative law judge will evaluate the findings using the relevant factors in paragraphs (a)

through (d) of this section, such as the consultant's medical specialty and expertise in our rules, the supporting evidence in the case record, supporting explanations the medical or psychological consultant provides, and any other factors relevant to the weighing of the opinions. Unless a treating source's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist, as the administrative law judge must do for any opinions from treating sources, nontreating sources, and other nonexamining sources who do not work for us.

20 C.F.R. § 404.1527.

Absent good cause, the opinion of a claimant's treating physician must be accorded considerable or substantial weight by the Commissioner. *Phillips v. Barnhart*, 357 F.3d 1232, 1240-1241 (11th Cir. 2004); *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *Broughton v. Heckler*, 776 F.2d 960, 960-961 (11th Cir. 1985); *Jones v. Bowen*, 810 F.2d 1001, 1005 (11th Cir. 1986). "Good cause" exists when: (1) the treating physician's opinion was not bolstered by the evidence; (2) the evidence supported a contrary finding; or (3) the treating physician's opinion was conclusory or inconsistent with the doctor's own medical records. *Phillips,* 357 F.3d at 1241; *see also Lewis*, 125 F.3d at 1440 (citing cases).

If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with other substantial evidence in the record, the ALJ will give it controlling weight. 20 C.F.R. § 404.1527(c)(2). Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent

evidence of a claimant's impairments.  *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also Schnor v. Bowen,* 816 F.2d 578, 582 (11th Cir. 1987).

The opinion of a non-examining physician is entitled to less weight, and, if contrary to the opinion of a treating physician, is generally not good cause for disregarding the opinion of the treating physician.  *See* 20 CFR § 404.1527(c)(1); *Broughton v. Heckler*, 776 F.2d 960, 962 (11th Cir. 1985); *Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir. 1984); *Hurley v. Barnhart*, 385 F. Supp. 2d 1245, 1255 (M.D. Fla. 2005).   Nevertheless, a brief and conclusory statement, not supported by medical findings, even if made by a treating physician, is not persuasive evidence of disability.  *Johns v. Bowen*, 821 F.2d 551, 555 (11th Cir. 1987); *Warncke v. Harris*, 619 F.2d 412, 417 (5th Cir. 1980).

"When electing to disregard the opinion of a treating physician, the ALJ must clearly articulate its reasons." *Phillips*, 352 F.3d at 1241.  Failure to do so is reversible error.  *Lewis*, 125 F.3d at 1440 (*citing MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986));[11] *see also Nyberg v. Comm'r of Soc. Sec.*, 179 F. App'x 589, 591 (11th Cir. 2006).

Although the issues here ultimately turn on medical opinions, the record reflects substantial objective medical evidence.  Claimant underwent MRIs on his lower back, right knee, and right hip.  The MRI of the right knee determined:  1) no evidence of acute injury; 2) rather marked atrophy and decrease delineation of the anterior cruciate ligament consistent with chronic change; and 3) slight degeneration

---

[11] *MacGregor* further held that "[w]here the [Commissioner] has ignored or failed properly to refute a treating physician's testimony, we hold as a matter of law that he has accepted it as true." 786 F.2d at 1053.

of the medial meniscus without definite tear noted. T. 317-18. The MRI of the right hip showed: 1) metallic foci about the right hip, illium and ischium, no gross evidence of definitive hip lesion, potential healed injury as discussed, some artifact limits the exam; 2) gross character left hip, otherwise unremarkable; and 3) SI joints, left pelvis, the deep pelvic structures grossly unremarkable. T. 337. Finally, the MRI of the lumbar spine, read by Dr. Sukstorf,[12] showed spondylosis with disc protrusion at L4-5 with impinged S1 roots and facet arthropathy. T. 338.

Turning back to the medical opinions, Dr. Buchalter's evaluation, although mentioned by the ALJ, was not analyzed in terms of weight afforded or reasons for discounting such an opinion. T. 16. Plaintiff posits that the ALJ substituted his own opinion for that of Dr. Buchalter. (Doc. 12, p. 10). Dr. Buchalter was providing an expert medical advisor evaluation, under Florida workers' compensation law, and, as such, is not treating physician. Dr. Buchalter was tasked mainly with addressing a treatment disagreement between Drs. Koulisis and Derbes regarding the proper treatment for Mr. Allen. As a result, Dr. Buchalter did not address whether Mr. Allen was limited from performing light or sedentary work. Dr. Buchalter concluded that a TENS unit and lumbar epidural injection would be appropriate, and if the epidural failed, a bilateral lumbar facet injection through either an intraarticular or medial branch block approach would be medically necessary and reasonable. T. 448. Dr. Joseph appears to have performed these procedures a few months later. T. 426-441. Dr. Buchalter's evaluation, in terms of the overall purpose of the evaluation, is not

---

[12] These observations appear in the "IMPRESSION" portion of the MRI report. For reasons not apparent, the "FINDINGS" portion, although confirming S1 impingement, does not confirm the L4-5 disc protrusion, and in fact notes, "on axial views as well through L4-5; unremarkable." T. 338.

directly relevant to the instant case. Dr. Buchalter's evaluation of plaintiff, however, does provide some insight into plaintiff's recommended course of treatment, and therefore, provides context into the severity of plaintiff's injuries. Moreover, Dr. Buchalter's assessments, at the very least, confirms other doctors' diagnoses. As such, the ALJ erred by failing to take into account Dr. Buchalter's opinion concerning plaintiff's treatment and medical assessment overall. Dr. Buchalter's opinion seemingly affirms Drs. Derbes and Joseph's medical recommendations regarding treatment.

Dr. Buchalter's opinion, while minor within the context of the entire medical record, merits discussion in order to fully address plaintiff's argument. In the undersigned's view, however, the more significant error stems from the ALJ's consideration of the remaining medical opinions of record. Taking the ALJ's comments at face value, the ALJ seemingly dismissed expert medical opinions because those opinions were inconsistent with the ALJ's assigned RFC. The ALJ must formulate the RFC assessment based on the properly weighted medical evidence of record. Inherently, then, the ALJ erred by discounting or dismissing medical opinions simply because such opinions were inconsistent with the RFC. This presents, respectfully, a cart-before-the-horse situation–RFC must be determined, at least in large part, based upon the medical findings. *See* 20 C.F.R. § 404.1545(a)(3).

Dr. Faruqui, a physician relied upon by claimant, examined plaintiff on a single occasion for social security disability purposes. T. 297. Following a physical examination, Dr. Faruqui found that plaintiff cannot "bend over or carry anything and not able to be in one position for prolonged time. [Plaintiff] is not able to sit, stand or walk for more than 15-20-minutes [sic] or maximum 30 minutes . . . . [D]ue to his

injuries he is not able to work at all and not able to get employment." T. 299. In terms of plaintiff's lumbar spine, Dr. Faruqui noted extension is limited to "about five-degrees." T. 299. Plaintiff is unable to squat. T. 299. Straight leg raise produced a limited range of motion on the right side and right hip pain. T. 299. Dr. Faruqui found diffuse tenderness in plaintiff's back. T. 298. Dr. Faruqui expressed no reservations or skepticism concerning plaintiff's complaints of pain and reiterated many of plaintiff's complaints in the assessment/recommendations portion of his evaluation. The ALJ gave Dr. Faruqui's findings "no weight," noting that Dr. Faruqui's assessment of "postural limitations . . . . [I]s not consistent with [Dr. Faruqui's] own findings, and is not supported by the record as a whole." T. 18. Given Dr. Faruqui's determinations discussed herein, the court cannot conclude that Dr. Faruqui's assessment of "postural limitations" is inconsistent with his own findings. The court also has difficulty determining which of Dr. Faruqui's findings are inconsistent with the medical evidence of record. The ALJ did not specify the particular findings he had in mind that supported such a conclusion. Moreover, the lumbar MRI, administered after Dr. Faruqui's determinations, appears consistent with Dr. Faruqui's conclusions.

Although not disputed by the claimant, Dr. Newsom's medical examination was relied upon by the ALJ, and therefore merits discussion. Dr. Newsom evaluated the plaintiff on a single occasion for Worker's Compensation purposes. T. 316. Dr. Newsom gave no indication of plaintiff's ability to do light or sedentary work, only discussing plaintiff's likely inability to "return[] to heavy work." T. 316. In fact, Dr. Newsom recommended a decrease in Tylenol intake and prescribed Ultram, a prescription opioid medication. T. 316. Dr. Newsom also recommended an MRI on

the right knee to evaluate possible meniscus injury and felt that plaintiff needed to follow up with an orthopedist. T. 316. Dr. Newsom noted lumber tenderness, consistent with the lumbar MRI administered a few days later. T. 316. Plaintiff reported an inability to sit for more than thirty minutes. T. 316. Dr. Newsom did not question plaintiff's reported pain and restrictions. The ALJ afforded Dr. Newsom's opinion "some weight," finding that it was largely consistent with the objective physical evidence in the record and the record as a whole. T. 18.

Dr. Baltazar, contracted by the Social Security Administration to perform a physical residual functional capacity assessment, checked boxes indicating, in his opinion, claimant could occasionally lift and/or carry 10 pounds, frequently lift and/or carry less than 10 pounds, stand and/or walk (with normal breaks) a total of at least 2 hours in an 8 hour workday, sit (with normal breaks) a total of about 6 hours in an 8 hour workday, and that claimant was limited in his lower extremities with regards to the ability to push and/or pull. T. 380. Dr. Baltazar, under section six of the report which requires citation to specific facts upon which the examiner's conclusions are based, cited the MRIs of plaintiff's lumbar spine and right hip, and noted "diffuse tenderness lower back." T. 380. Dr. Baltazar also detailed "marked" decrease in right hip range of motion and decreased sensation in right inner leg. T. 380. Dr. Baltazar, like other physicians, found claimant to be credible. The thrust of the opinion, therefore, is that claimant would need to stand and/or walk for about two hours in an eight hour work day and sit (with normal breaks) for about six hours in an eight hour work day, a possibility the vocational expert explicitly ruled out. T. 39-40. The ALJ gave Dr. Baltazar's findings "little weight;" to the extent that Dr. Baltazar's conclusions were more restrictive than the ALJ's assessed residual

functional capacity. Such findings, the ALJ posited, were also not consistent with the medical evidence or supported by the record as a whole. T. 18. Again, the court cannot determine what objective medical evidence, or what part of the record as a whole, contradicts Dr. Baltazar's limitations. The objective evidence relied upon by Dr. Baltazar is not inappropriately characterized in his report, and the findings used to make his assessment are consistent with those of other doctors, and, seemingly therefore, with the record as a whole.[13]

Dr. Goodwiller, an orthopaedic surgeon, noted on several occasions that Mr. Allen was capable of working at "sedentary levels." T. 366, 368, 370, 442. Importantly, Dr. Goodwiller appeared primarily concerned with Mr. Allen's right hip and, to a lesser extent, the right knee. Dr. Goodwiller saw Mr. Allen frequently post-surgery ranging from December 15, 2008, through May 2010. Dr. Goodwiller noted that an MRI of the right knee evidenced "slight degeneration of the medial meniscus without tear . . . atrophy of the ACL. No evidence of acute injury noted." T. 370. In the MRIs of claimant's right hip and lumbar spine, Dr. Goodwiller noted no gross evidence of hip lesion and hardware related to claimant's fracture, and indicated a "disc protrusion with abatement of both S1 nerve roots, which are displaced," respectively. T. 369. In assessing plaintiff's hip, Dr. Goodwiller noted that the joint space is "well maintained" and hip surgery is not "eminent [sic]." T. 370. In Dr. Goodwiller's opinion, surgical management did not appear likely to benefit claimant at that point in time. T. 369. Dr. Goodwiller's impression was "right acetabular fractures" and a "strain[ed] right knee with MRI findings as noted above." T. 370.

---

[13] Although the ALJ is certainly not bound by the examiner, neither should the ALJ overlook consistencies in the examiner's opinions and those of treating physicians.

As discussed previously, Dr. Goodwiller, in his last follow-up with the plaintiff, noted tenderness in the right anterior hip, but "full motion" of the hip present. T. 442. In regard to plaintiff's hip, Dr. Goodwiller opined that plaintiff can work as long as there is no bending, stooping, climbing, or prolonged standing. T. 412. In terms of treatment, Dr. Goodwiller prescribed Meloxicam and thought vocational redirection should be given "strong consideration." T. 370. On February 17, 2009, Dr. Goodwiller injected plaintiff with 4 cc's of .5% Marcaine. T. 367. In a visit two weeks later on March 4, 2009, plaintiff expressed improvement in his right knee pain with injection. T. 366.

Dr. Goodwiller's close treating relationship with the claimant over a nearly seventeen month span certainly suggests that ordinarily Dr. Goodwiller's opinion would be given significant weight. The ALJ, however, afforded Dr. Goodwiller's opinion no weight because "[Dr. Goodwiller's opinion] is not consistent with his own treating records, indicating mild objective findings and conservative treatment." T. 17. As discussed previously, Dr. Goodwiller's examinations focused chiefly on the right knee and right hip. Dr. Goodwiller devoted little or no discussion to plaintiff's lumbar spine and the lumbar spine MRI. Dr. Goodwiller, therefore, believed Mr. Allen capable of only sedentary work even without the additional limitations of Mr. Allen's lumbar spine and back.[14] Even on the last visit, Dr. Goodwiller addressed only the hip, but did note "intractable right groin pain." T. 442. The ALJ's conclusion, in light of the foregoing issue, seems to mischaracterize Dr. Goodwiller's findings as mild. Dr. Goodwiller also prescribed opioid painkillers for Mr. Allen and

---

[14] In terms of the relative limitations stemming from the lumbar spine and back, Drs. Baltazar and Derbes' opinions addressed such issues more directly.

injected Mr. Allen with Marcaine.  Although certainly not as significant as surgery, Dr. Goodwiller's treatments do not give rise to an inference of such minimal treatment as would obliterate Dr. Goodwiller's opinions.

Dr. Derbes examined the claimant, in person, on four different occasions in 2009.  Claimant complained mainly of low back pain.  T. 400.  As noted by the ALJ, "to the extent that Dr. Derbes opinion is more restrictive than the assessed residual functional capacity," such an opinion merits "little weight."  T. 18.  In the ALJ's opinion, the restrictions imposed by Dr. Derbes were "not consistent with the medical evidence of record or supported by the record as a whole."  T. 18.  The ALJ, however, gave "significant weight" to Dr. Derbes' opinions that were "consistent with the residual functional capacity to perform light level work."  In his assessment of claimant, Dr. Derbes concluded, "lumbar light duty: no lifting greater than 20 pounds, no prolonged bending, stooping, squatting, kneeling, static squat, ladder climbing, crawling or repetitive use of the legs.  No working in situations where the inability to use legs might put the patient in a position for injury."  T. 394, 398, 401.  Nevertheless, Dr. Derbes consistently diagnosed significant back issues, including chronic low back syndrome, T. 391, 396, 401, L5-S1 degenerative disc disease with S1 radiculitis, T. 391, 396, 401, and facet arthropathy/clinical symptomatology, T. 391, 396.  In Dr. Derbes' final examination of Mr. Allen on September 30, 2009, Dr. Derbes noted lumbar swelling, tenderness in the right, decreased range of motion and pain, and pain upon sitting.  T. 392.  Mr. Allen described his lower back pain as "sharp shooting and miserable," aggravated by standing or sitting.  T. 393.  In regard to treatment, Dr. Derbes appears to have administered a lumbar facet joint injection at L4-5, L5-S1 on the right and an epidural at L5-S1 on the right.  T. 395.  As to

medication, claimant was prescribed Neurontin and Ultram, T. 390, 394, 397, and at times prescribed Mobic. T. 393, 397. Additionally, Mr. Allen was to take Neurontin five times a day. T. 394.

Again, the court has difficulty determining how such findings and limitations are inconsistent with the medical evidence and record as a whole. The ALJ fails to point to specific findings in Dr. Derbes' diagnosis that are inconsistent with, or more restrictive than, other medical evidence in the record. Seemingly, the ALJ focused upon Dr. Derbes' assessment concerning claimant's lumbar ability which supports, to some degree, the ALJ's RFC, but ignored objective findings that ran counter to the ALJ's assessed RFC. The ALJ cannot dismiss an expert medical opinion because the opinion is inconsistent with the ALJ's assigned RFC. *See Marbury v. Sullivan*, 957 F.2d 837, 840–41 (11th Cir. 1992) (Johnson, J., concurring) ("An ALJ sitting as a hearing officer abuses his discretion when he substitutes his own uninformed medical evaluations for those of a claimant's treating physicians . . . . [A]s a hearing officer [the ALJ] may not arbitrarily substitute his own hunch or intuition for the diagnosis of a medical professional."); *see also Hillsman v. Bowen*, 804 F.2d 1179, 1182 (11th Cir. 1986) ("Here . . . the ALJ has rejected the opinions of the treating physician not even on the basis of a differing opinion expressed by another doctor, but rather because ALJ himself reached a different conclusion after viewing the medical records. Such circumstantial evidence cannot alone support a finding of a nonsevere disability in the face of an opposing conclusion by the treating physician."); *Freeman v. Schweiker*, 681 F.2d 727, 731 (11th Cir. 1982) (finding that, "the ALJ improperly substituted his judgment of the claimant's condition for that of the medical and vocational experts"). Here, ALJ rejected portions of the opinion of a treating

physician, Dr. Derbes, because those portions differed from the ALJ's opinion. The ALJ must consider Dr. Derbes' entire opinion, not just those parts consistent with the ALJ's own conclusions.

Dr. Joseph examined the plaintiff in person on five separate occasions in 2010. Plaintiff complained of "low back pain radiating to right hip and down right leg to ankle." T. 428. After a thorough review of the medical records and physical examination of the plaintiff, Dr. Joseph concluded that claimant "can work at a light duty or sedentary physical demand level," but did not envision claimant capable of performing heavy duty work. T. 437. Dr. Joseph found intractable low back pain, T. 440, and lumbar facet syndrome. T. 438. Dr. Joseph also noted chronic low back pain. T. 438. Addressing the lumbar spine, Dr. Joseph noted it was "extremely tender on both the right and left side." T. 436. As to claimant's hip, Dr. Joseph wrote "[f]lexion, abduction, internal rotation was mostly significant for hip pain." T. 436. In terms of treatment administered, plaintiff received a lumbar epidural steroid injection, after which plaintiff reported "good relief of pain," T. 440-41. Claimant also received a "bilateral lumbar diagnostic L4-L5 and L5-S1 facet joint median branch blocks by blocking the bilateral L4, L5, and S1 branch at the sacral ala dorsal median branch nerves," which fully relieved any pain plaintiff was experiencing. T. 438-39. Dr. Joseph felt it was "medically necessary" to do both sides at the same because of near equal pain on either side. T. 438. In a follow up visit, Dr. Joseph noted only one tender spot in plaintiff's back. T. 426. Dr. Joseph's goals for plaintiff were to get him off pain medication and back to work. T. 427.

The ALJ gave "great weight" to Dr. Joseph's medical opinion and noted that the opinion "is consistent with the medical evidence of record and the record as a

whole." T. 17. Unaddressed, however, are Dr. Joseph's findings concerning back pain, lumbar facet syndrome, or any of the limitations detailed by Dr. Joseph in the initial visit. Dr. Joseph's diagnosed limitations are similar to limitations noted by other physicians who examined plaintiff. These physicians' opinions, however, were discounted by the ALJ as not being consistent with the record as a whole or objective medical evidence. Moreover, the very nature of treatments that Dr. Joseph administered–diagnostics, lumbar epidurals, and branch blocks–indicate more than a conservative treatment. Without discussing Dr. Joseph's treatment history, the ALJ concluded that Dr. Joseph's opinion is consistent with the medical evidence and the record. The ALJ, in discounting and dismissing several other physicians' findings, cited the physicians' conservative treatment of plaintiff as a factor for doing so. In Dr. Joseph's case, however, the ALJ avoided discussion of treatment altogether, perhaps because such information would appear inconsistent with the ALJ's RFC assessment. The ALJ seemingly emphasized portions of Dr. Joseph's opinion and ignored other parts in an effort to affirm his own conclusions concerning plaintiff's RFC. In doing so, the ALJ's analysis is internally inconsistent and incorrect overall.[15]

The opinions of Drs. Goodwiller, Derbes, Faruqui, and Baltazar, were all discounted or rejected by the ALJ due to inconsistencies with the ALJ's established RFC, their own treatment records, the medical evidence, or the record as a whole.

---

[15] Even the ALJ's summary of the medical evidence is incomplete and inaccurate. The ALJ states, in his opinion's recapitulation of medical evidence and treatment, that "[t]he claimant has been treated conservatively, since his hip surgery following his injury in 2007. The record indicates that [Mr. Allen's] treatment has consisted of brief periods of physical therapy, a home exercise program, medications, and ice." T. 17. The plaintiff's history of injections, including spinal injections, is notably absent.

The ALJ accepted Dr. Newsom's opinion that plaintiff is likely unable to return to heavy work, but such an opinion does not address plaintiff's limitations concerning light or sedentary work, and therefore has little relevance to formulating the RFC–other than ruling out heavy work. One might ask, in essence, if every medical opinion, save Dr. Joseph's, is given little or no weight, what is the medical evidence of record with which Dr. Joseph (or the ALJ) agrees? The medical evidence, properly considered in light of the Commissioner's regulations, dictates the residual functional capacity of the claimant, not vice-versa.

In sum, the ALJ's recitation of the medical evidence and judgment regarding weight afforded to the individual physicians' opinions is not sustainable. Taken together, the opinions present in the record, as well as the objective medical evidence and record as a whole, do not demonstrate substantial evidence supporting the ALJ's residual functional capacity assessment. Accordingly, a proper evaluation of the physicians' opinions and objective medical evidence must be made, and following these determinations, the ALJ shall formulate the residual functional capacity.

ACCORDINGLY, it is ORDERED:

The Commissioner's decision should be set aside, and the matter REMANDED for further proceedings consistent with this order.

At Pensacola, Florida, this 25th day of March, 2013.


*/s/ Charles J. Kahn, Jr.*
**CHARLES J. KAHN, JR.**
**UNITED STATES MAGISTRATE JUDGE**